For the reasons heretofore stated, the judgment is reversed, and the cause remanded.

---

## HAYTER v. HUDGENS.	(No. 2969.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 26, 1924. Rehearing Denied Jan. 5, 1925.)

1. Fraud ⟨key⟩58(1)—Evidence held not to show concealment by broker and another with intent to defraud principal.

In action against plaintiff's broker, authorized to sell land for $10,000 cash, and against defendant, for fraud because broker had failed to disclose negotiations for sale to prospective purchaser for $10,000 on terms requiring extension of credit, and had suggested vendor sell it to defendant for $7,500, evidence *held* not to show concealment with intent to defraud.

2. Fraud ⟨key⟩58(1)—Purchaser held not shown to be liable for broker's concealment of facts from principal.

Where plaintiff's broker, authorized to sell land for $10,000 cash, stated he could not sell,

and suggested that plaintiff sell to defendant, which he did at price of $7,500, *held*, that if it had been broker's duty to inform plaintiff that a third party had proposed to purchase for $10,000 but not for cash, plaintiff's remedy would have been against broker alone, and mere conjecture of his collusion with defendant would not be sufficient to charge defendant with liability for fraud.

Appeal from District Court, Rusk County; Charles L. Brockfield, Judge.

Action by W. M. Hudgens against S. B. Hayter and another. Judgment for plaintiff, and defendant named appeals. Reversed and rendered, as to defendant Hayter.

See, also, 236 S. W. 232.

The action is by appellee against A. D. Edens and the appellant to recover against them jointly and severally the sum of $2,500 as damages alleged to have been sustained as the result of fraud and deceit practiced, causing the appellee to sell certain land to appellant for a less sum of money than he could have realized in the sale of the land to another person then ready and willing to buy the property at a higher price. The petition set forth, as pertinent to state, that:

"A. D. Edens, acting as agent for plaintiff to make a sale of the land, did about October 15, 1918, make a sale of the land to said W. H. Hargrove, at the price asked by the plaintiff, namely, $10,000, and that the said Hargrove on said date placed with the said A. D. Edens, agent of the plaintiff, his check for $1,000 as earnest money that he would purchase the land."

The petition then alleges, as grounds of liability, as follows:

"Plaintiff says that after the farm had been fairly and squarely sold to the said W. H. Hargrove by the said A. D. Edens, as agent of the plaintiff, on terms acceptable to all of the said parties, and while the said W. H. Hargrove was making his arrangements to consummate the deal for the purchase of the farm, the said A. D. Edens conspired and confederated with the defendant, Sam B. Hayter, to perpetrate a fraud on plaintiff this way, namely, that as soon as the said A. D. Edens had closed the deal with the said W. H. Hargrove for the said farm, he notified plaintiff that he did not think that he could find a purchaser for plaintiff at the price plaintiff was asking for the farm, but that he thought that said Sam B. Hayter would buy the same for a less sum, and that if he wanted to sell the farm to said Sam B. Hayter that he, the said A. D. Edens, would not charge the plaintiff any commission for making such sale, but that he would insist on being paid a 5 per cent. commission if plaintiff sold to any one else than the said Sam B. Hayter. And, being ignorant of the facts above set out, and believing and relying solely on the representations of the said A. D. Edens with reference to the failure to sell said farm for the sum of $10,000, and, that it could not be sold to any one for such sum and that he had best

sell it to said Sam B. Hayter for the sum of $7,-500, the plaintiff finally agreed to sell the farm to Sam B. Hayter for the sum of $7,500, and on November 20, 1918, in Henderson, Tex., executed his deed to said farm to the said Sam B. Hayter; and thus was consummated the fraud which the said A. D. Edens and S. B. Hayter agreed and conspired to perpetrate upon the plaintiff."

The defendants each filed an answer to the suit in denial of all the allegations in the petition. The following special issues were submitted to the jury:

"Did A. D. Edens conceal any facts from W. M. Hudgens that caused said Hudgens financial loss?"

The jury answered: "Yes."

"Was there any understanding between A. D. Edens and S. B. Hayter to conceal from W. M. Hudgens any facts regarding the sale of the farm?"

The jury answered: "Yes."

"State if there was any financial loss to the plaintiff; and if so, in what amount."

The jury answered: "$2,500."

In keeping with the verdict, the court entered judgment in favor of the appellee for $2,500 less $500 as a commission to the real estate broker. The appellant alone has appealed from the judgment.

The evidence shows that A. D. Edens was a real estate broker residing in Nacogdoches. The appellee, who resided in the adjoining county of Rusk, owned a tract of land in Nacogdoches county, and against the land was an outstanding purchase-money note for $6,576 in 1919. Mrs. Hayter, mother of the appellant, held the note as purchaser of the same, but the appellee did not, it appears know who held the note. The appellee desired to sell the land in order to pay off the note and to obtain cash money for certain uses. He went to Nacogdoches and listed the land for sale with A. D. Edens, agreeing to pay him a commission therefor; A. D. Edens was to find a purchaser for the land at the fixed price of $10,000 cash. This was in September of 1918. Afterwards, about October 15, 1918, W. H. Hargrove, residing in Franklin county, went to Nacogdoches with the view of buying a farm in that county, and there he met A. D. Edens. Mr. Edens offered to sell to Mr. Hargrove the land in suit for $10,000 cash. Mr. Hargrove was unable to pay $10,000 cash for the land, but offered to buy the land, which he had previously looked over, for that sum on the following terms: To pay $1,000 cash and vendor's lien notes against land in Hopkins county aggregating $3,000, and to pay $700 annually for 9 years, with 8 per cent. interest, until the balance of $6,000 was paid in full. After this offer was made, Mr. Hargrove, continuing, said: "If Mr. Hudgens wanted all cash he will have to get somebody to take up the notes and make it a cash transaction to Mr. Hudgens." Mr. Edens then replied, "I would have to find some man to

268 S.W.—31

take up these notes." The negotiation and conversation there rested for the time being. The next day, it appears, Mr. Edens and Mr. Hargrove had "a second conversation" about the sale of the land. Mr. Edens then told Mr. Hargrove "that Mr. Hayter would take up the notes, provided the notes were made payable direct to him. He told me at that time he had seen Mr. Hayter about it." Mr. Hargrove then offered to put up $1,000, evidenced by a check, as earnest money to carry out the offer of purchase under the terms stated, and Mr. Edens agreed to take the check and to undertake to effectuate the sale and purchase. Mr. Hargrove then returned to his home in Franklin county. Mr. Edens sent the check through a bank for collection, and it was returned uncollected, with the notation by the bank on which it was drawn, "insufficient funds." Mr. Edens never informed appellee of the offer of Mr. Hargrove, and the appellee never knew of said offer until a long time afterwards. Mr. Edens testified:

"The place was at this time not sold to Mr. Hargrove; after his check was turned down I considered the trade absolutely off for him. I considered the trade between me and Mr. Hargrove to be absolutely done away with."

Mr. Hargrove was 74 years old, and possessed, as shown by the evidence, of very little property, and dependent upon farming for income and support. Afterwards, on November 20, 1918, appellant purchased the land from appellee, paying $7,500 cash therefor, that is, he paid appellee's vendor's lien note against the land, and the difference in cash to the appellee. On February 21, 1919, appellant sold and made a deed to the land to Mr. Hargrove for $10,000, receiving $1,000 cash and Mr. Hargrove's vendor's lien notes aggregating $9,000, payable in annual installments with interest, over a period of 14 years. The appellee specially testified that in November, 1918, after listing the land with Mr. Edens, he—

"went down to see if anything had been done, and he [Mr. Edens] told me that he couldn't sell the land from the fact that 'if a man had that much money he didn't want to pay it for the place, and if he didn't have the money he could not pay the interest; and I don't believe I can sell it. But Mr. Hayter deals in land, and if you can sell it it to him there will be no commission;' that Mr. Hayter was a man that dealt in land and that Mr. Hayter would probably buy the farm, and if I sold to him there would be no commission. Mr. Edens said no more than if I could sell to Mr. Hayter there would be no commission on it; that Mr. Hayter was a man that dealt in land, and if I sold to him there would be no commission; he would not charge me any commission. He told me that probably Mr. Hayter might buy it. * * * I saw Mr. Hayter in his office. My son was with me. As to what I offered to take for the place that afternoon I will state that I finally offered to take $8,076,

and Mr. Hayter told me that he would give it. He said, 'I have a man in town now that I think will take it at that,' and he went out to see the man and came back and says, 'I think he has gone home, and I can't find him.' Then he wrote me an order for $8,076 provided his man took it when he could see him. He was to 'phone me in a day or so. Then I went home. He did not 'phone me, and my son wrote to him for me, and he then 'phoned me. He said over the 'phone that he would give $7,500 for the place if I would take it right then and go to Henderson and get a lawyer to draw the deed, and to draw the money by draft on Nacogdoches. I agreed to take it, and I did draw on him for $7,500. Mr. Hayter did not tell me to see Mr. Edens about the commission. Mr. Edens never told me about the Hargrove trade."

Mr. Edens specially testified:

"After the trade with Mr. Hargrove had fallen down and the check returned unpaid, Mr. Hudgens came into my office. I don't remember the date. He came to ask me about the sale of the place. I told him that I had showed it to several persons, but did not have any definite proposition to submit to him. He then wanted to know if he sold the place himself, would there be any commissions charged by me. I told him that I did not want to release my contract, so he left the office. In the afternoon he came back into my office and told me he could sell to Mr. Hayter. I said. 'Well, if Mr. Hayter will take it and let my contract with you stand until spring, it will be all right to sell to Mr. Hayter.' He then went to Mr. Hayter's office, and his son and I went with him, and we had an agreement with Mr. Hayter about commissions: That Mr. Hayter would leave the property in my hands for sale until January 1st and pay the commission for sale. There never was an understanding or word between Mr. Hayter and me to divide any excess above $7,500, or with reference to the Hargrove offer. Before the sale by Mr. Hudgens to Mr. Hayter, I didn't know that I was going to sell it to Mr. Hargrove. I did get a commission from Mr. Hayter for the sale of the land to Mr. Hargrove when it was deeded to Mr. Hargrove afterwards by Mr. Hayter. I sold it for Mr. Hayter. Under the contract I had with Mr. Hudgens I tried hard to sell the place to several different parties, but did not bring about a sale of the place."

Mr. Hayter specially testified:

"He [appellee] came into my office and talked to me about the place. He made me a proposition of sale. I told him that would be too much money to lose. He told me he would like to sell it, as he needed money. I told him that we might trade, but that I would not buy it at any price until he first consulted his wife and children; that it would make a good home to live on. I said, 'You go home and tell your family what you are figuring on, and in the meantime I will look at the place, and if I decide to buy it then we can get together on it. Before he left the office I asked him if he had the place listed for sale with any one. He told me he had listed it with Mr. Edens. I suggested that he had better see Mr. Edens and have an understanding about the commission.

Later in the day he came back with Mr. Edens and they discussed the matter. I did not know until I saw him that it had been listed. I had not talked with Mr. Edens, nor did I know that it had been listed with Mr. Edens. I did not have anything to to do with Mr. Hudgens coming to my office. I did not send for him. I did agree with Mr. Edens, when he and Mr. Hudgens came to my office, that I would pay a commission to him to sell or help sell the place if I bought it, for I was buying the place to sell. There was no trade or understanding between him and me to divide any excess above $7,500. I told Mr. Hudgens I would 'phone him and let him know about buying the place. I had no specific agreement with him at that time about the place. After he left I made an investigation of the place. I then 'phoned Mr. Hudgens that the place was not what I expected to find it; that it was washed considerably, and that I did not feel like paying more than $7,500. I authorized him to draw on me for the difference between the note he owed on the place and $7,500, and which he did do. I did not know at that time that Mr. Edens had agreed to sell it to anybody. It was not until some time after I had gotten the Hudgens deed that I knew about Mr. Hargrove. It was several weeks afterwards that Mr. Edens told me about the Hargrove offer. I then investigated the Hargrove offer, and after the investigation I told Mr. Edens that I did not think much of his offer, and insisted that he find some other purchaser. Finally, I concluded to take chances on the sale to Mr. Hargrove rather than rent the place out to some one."

There is affirmative evidence in the record that the market value of the place at the time of the sale to Mr. Hayter was $7,500. Appellee, though, testified that he valued the land at $10,000.

S. M. Adams, of Nacogdoches, for appellant.

R. T. Jones, of Henderson, for appellee.

LEVY, J. (after stating the facts as above). The assignment of error controlling the appeal is the one questioning the sufficiency of the evidence to warrant the verdict against the appellant. In passing upon the assignment of error, regard must be had to the pleading and the special facts and circumstances in proof relied on as creating the appellant's liability. As pleaded, liability against appellant was based, in effect, upon the ground that the real estate agent, in the course of the agency, was guilty of fraud and concealment, and that the appellant was a party thereto acting in collusion with the real estate agent, inducing the appellee to sell his land for $2,500 less than he could have realized therefrom. The acts and statements relied upon by appellee appear in his evidence as follows:

"About the middle of November, 1918, after listing the land with Mr. Edens, I went down to see if anything had been done. He [Mr. Edens] told me that he could not sell the land from

fact that if a man had that much money he did not want to pay it for the place, and that if he did not have the money he could not pay the interest, 'and I don't believe I can sell it. But Mr. Hayter deals in land, and if you can sell it to him there will be no commission.' Mr. Edens said no more than that Mr. Hayter was a man that dealt in land, and if I sold to him there would be no commission charged; that probably Mr. Hayter might buy it. Mr. Edens never told me anything about the Hargrove deal, and I did not know of it at the time."

It was the above-stated conduct and statements of Mr. Edens, in response to appellee's inquiry, that induced appellee, as he says, to make the sale of the farm to appellant for $7,500. At the time the statements above were made to appellee, the land had been in Mr. Edens' hands as a real estate broker for about 60 days. During that period of 60 days Mr. Edens had diligently tried, it appears, to sell the land, and specially so, to several different parties whose names are given, for the price asked of $10,-000 cash, and he had failed to find a purchaser ready and able to pay that sum of money in cash. There was no evidence to the contrary. The proposition of Mr. Hargrove to purchase was admittedly not for $10,000 cash, or any considerable part of it cash. It conclusively appears that Mr. Hargrove was financially unable to pay that sum, and was 74 years old and without much means on hand or available to him in the future. The representation, then, of Mr. Edens, was not wholly untrue, or shown to be nonexistent in fact, that "I don't believe I can sell it," and "I could not sell it," meaning, as both parties understood, for the price of $10,000 cash. So far, then, as the prospects of a cash sale of the land for the fixed sum of $10,000 cash was concerned, it undeniably appears that Mr. Edens imparted correct information. If it be true, as appears in the record, that a cash sale for $10,000 had not been made, or could not likely have been made, at the time the statement was made, then, in such circumstances, it was not a breach of duty nor a fraudulent act on the part of Mr. Edens to merely refer appellee to the appellant as a man who "deals in land," and who "probably might buy it," meaning, as both the parties fully understood, for a cash price. Nor was it an act inconsistent with fair dealing for Mr. Edens to offer to make no charge of "commissions" in case the appellee himself brought about a sale of the land to Mr. Hayter. And the appellant, under such circumstances, could buy the land from the appellee and not be held liable in damages for so doing, since he did not misrepresent the value of the land or obtain the land for a gross undervaluation, nor commit or become a party to any fraud in this respect to its acquisition.

The appellee was the owner of the land,

and had been on the land and was fully acquainted with its value; and there is affirmative evidence that the price of $7,500 paid by the appellant was the market value of the land at that time. The case therefore against appellant, if a case exists at all, lay in the further contention that there was shown a collusion between Mr. Edens and appellant and fraud and concealment were practiced, to deprive appellee of the benefit of a negotiated sale of the land to W. H. Hargrove for $10,000. In this respect it affirmatively appears that Mr. Edens did undertake to negotiate a sale of the land to Mr. Hargrove, and that he did not, in response to appellee's inquiry, state to appellee "anything about the Hargrove deal," and that appellee was ignorant of that fact at the time of sale to appellant. Mr. Hargrove, though, it is conclusively shown, did not offer to pay $10,000 cash for the farm, and, as the record shows, he was wholly unable financially to pay that amount in cash. His offer was to buy the land on terms, to pay $1,000 cash, transfer vendor's lien notes on land in Hopkins county aggregating $3,000, and give his notes for the balance of $6,000, payable $700 each year thereafter for 9 years. This offer of Mr. Hargrove was accompanied with the suggestion to Mr. Edens that "if Mr. Hudgens wanted all cash, he will have to get somebody to take up the notes and make it a cash transaction." Mr. Edens made the reponse to the suggestion, "I would have to find some man to take up these notes." The next day Mr. Hargrove came back to Mr. Edens' office, it appears, and Mr. Edens then informed Mr. Hargrove "that Mr. Hayter would take up the notes, provided the notes were made payable directly to him." Under these circumstances an oral executory agreement was entered into between Mr. Edens and Mr. Hargrove, by which Mr. Hargrove agreed to put up $1,000, evidenced by his personal check, as earnest money to carry out the offer of purchase under the terms stated, and according to the condition that Mr. Edens could find "some man to take up the notes" so as to "make it a cash transaction to Mr. Hudgens," and Mr. Edens agreed to take the check and to effectuate the sale and purchase according to the said terms and condition. Mr. Edens then, it appears, forwarded the check for collection, and it was duly returned with the notation by the bank on which the check was drawn, "insufficient funds." After the check was returned unpaid, Mr. Edens made no further effort whatever to effectuate a sale or comply with the said proposed plan or conditions to bring about a sale. Mr. Edens testified: "After his check was turned down I considered the trade absolutely off for him, to be absolutely done away with."

[1] In view of these facts it is clear that Mr. Edens was not acting in the scope of his

authority in undertaking to negotiate a sale of the land to Mr. Hargrove. Mr. Edens' authority from appellee was to find a purchaser for the land at the fixed price of $10,-000 cash, and he was not authorized to sell or to negotiate a sale on wholly different terms. Consequently, if Mr. Edens did make an executory agreement with Mr. Hargrove to sell him on the terms proposed, the agreement was beyond his authority, as a special agent with limited authority, to make, and could not have been enforced against appellee in a suit of specific performance brought by Mr. Hargrove. And, too, the agreement with Mr. Hargrove being of no legal force against appellee, as without authority to make, Mr. Edens could, as against appellee, abandon it without incurring legal liability therefor to appellee. Then Mr. Edens was under no legal duty, in virtue of his special agency, to inform the appellee of the proposal of Mr. Hargrove, and he could not be held liable, as for a legal wrong, in failing to do so. It may be that appellee had the right, if he desired, of carrying out or repudiating the proposal of Mr. Hargrove, but he could refer the failure to exercise the election to the violation of no legal duty owing him by Mr. Edens. It is a known rule that fraud cannot be predicated upon the nonperformance of acts complained of which by law a party is not bound to do. Ins. Co. v. Humphrey, 65 Ind. 549, 32 Am. Rep. 78. And besides, the evidence, when all of it is considered, strongly shows a simple failure on the part of Mr. Edens to disclose to appellee the proposal of Mr. Hargrove, rather than a concealment of the fact in the sense of a fraudulent design or purpose. He had ample ground, in the exercise of reasonable care, to refuse, as in his discretion, to refer or recommend to appellee the proposed buyer as one able to carry out the terms of purchase. His check had been returned unpaid, he was without much means or available means, and was 74 years old, dependent upon his own exertions in farming for support and maintenance. If on this account Mr. Edens dropped, as he did, the negotiation with Mr. Hargrove, then fraudulent concealment, as ground for liability, cannot be imputed to him through simple failure to disclose to appellee the fact of negotiation with Mr. Hargrove.

[2] But assume that Mr. Edens was bound to inform the appellee of the proposal of Mr. Hargrove, and he failed in the duty, Mr. Edens alone would be liable to appellee for failure to do his duty to his principal. For the facts and circumstances show, at best, only a possible purpose on the part of appellant to collude with the real estate agent in fraud of appellee, either in misrepresentation or concealment. A mere conjecture, suspicion, or surmise is not sufficient to authorize a finding to that effect, but there must be some substantial evidence to support a finding of its existence. The legal presumption is in favor of good faith and honesty, wherefore fraud is not presumed, but must be established by proof, positive or circumstantial, the burden being on the party pleading it. Sparks v. Dawson, 47 Tex. 138; Ney v. Rothe, 61 Tex. 374; Rider v. Hunt, 6 Tex. Civ. App. 238, 25 S. W. 314.

On the former hearing of the case, 236 S. W. 232, it was specially noted that "appellants did not offer any testimony at the trial, and it is apparent that the case, even from appellee's viewpoint, was not fully developed." The ruling there was, as stated, upon the "meager testimony adduced." The present record fully develops the case.

We conclude that the judgment should be reversed so far as it pertains to appellant, and that judgment should be here rendered that appellee take nothing as against him, and it is accordingly so ordered. The cost of appeal is taxed against the appellee.