**CITY OF CORPUS CHRISTI, Appellant,**

v.

**A. W. GREGG et al., Appellees.**

No. 12716.

Court of Civil Appeals of Texas.

San Antonio.

Nov. 24, 1954.

Rehearing Denied Jan. 19, 1955.

Further Rehearing Denied Feb. 16, 1955.

I. M. Singer, Keys, Russell, Keys & Watson, Corpus Christi, for appellant.

Dan Moody, Dan Moody, Jr., Austin, B. D. Tarlton, Corpus Christi, C. E. Bryson, Houston, John Miller, Sinton, Wm. E. Nichols, Aransas Pass, J. C. Tenrus, William B. Moss, Sinton, Lewright, Dyer, Sorrell & Redford, Corpus Christi, for appellees.

NORVELL, Justice.

This suit was brought by A. W. Gregg to validate four oil and gas leases held by him and purportedly executed for and on behalf of the City of Corpus Christi. By way of cross-complaint, the City sought a decree cancelling the leases and named A. W. Gregg, Sam Susser and Leslie Wasserman as cross-defendants. Upon motion, Wasserman was dismissed from the suit over the City's objections.[1] At the

---

1. The record discloses that some months prior to the filing of the City's amended cross-action impleading Wasserman as a co-conspirator with Susser and Gregg, and seeking a return of the $30,000 allegedly paid by Gregg to Wasserman, upon the theory that it was a part of the consideration given for the lease involved, Gregg, Susser and the City of Corpus Christi entered into a stipulation wherein they agreed to sever all claims, demands and causes of action of every kind and character, alleged, asserted or claimed by any of the parties against the others, except the claims of Gregg against the City and the City's defenses thereto; the City's claims against Gregg and Gregg's defenses thereto, and the claims of the City against Susser and his defenses thereto. In our opinion, the purpose of this stipulation was to lessen and simplify the issues to be tried in this particular suit, and under a fair interpretation thereof the assertion of new and different claims was precluded. The trial court so construed the stipulation and there was no error in his dismissing Wasserman from the suit.

conclusion of the evidence, the court, instructed the jury to return a verdict in favor of Gregg and Susser, whereupon judgment was rendered validating the four oil and gas leases in question and decreeing that the City take nothing against Gregg and Susser.

The City by its first point urges that the evidence was sufficient to take the case to the jury upon the pleaded theory that Gregg had obtained the oil and gas leases by fraud. It is specifically contended that the evidence if credited was sufficient to show that Gregg had paid some $30,000.00 to Wasserman, who was Mayor of the City of Corpus Christi, and that such sum was paid for Wasserman's corrupt services in influencing the action of the city council in executing the leases.

It appears that Gregg had known Susser for some time prior to December, 1949, and that the two had been jointly interested in certain oil and gas operations in West Texas. Largely at the instigation of Susser, Gregg decided to investigate oil and gas production opportunities in the Corpus Christi area and entered into an agreement with Susser that should any leasehold interests be acquired they would be held jointly, Gregg owning a two-thirds interest and Susser a one-third interest therein. Gregg came to Corpus Christi some time during the month of December, 1949, and became acquainted with Leslie Wasserman, the Mayor of Corpus Christi, who was a friend of Susser's for many years. Wasserman was then engaged in the upgrading of Mexican cotton, that is, mixing domestic cotton with that which he had imported and selling the combined product. He applied to Gregg for a loan of $20,000.00 and represented that he expected to make a $30,-000.00 profit in his cotton activities. Gregg did not loan this money to Wasserman direct, but on January 4, 1950, he signed a note which was also executed by Wasserman and his wife, for the principal sum of $20,000.00, payable to the order of the City National Bank of Houston. Wasserman received the proceeds of this note,

but it appears that the bank advanced the money upon the strength of Gregg's credit. Wasserman made some interest payments upon this note but ultimately defaulted, and in June of 1951 the bank called upon Gregg to take up the note, which he did. It also appears that on February 20, 1950, Gregg paid one, E. G. Lyon, the sum of $10,000.00 in order to discharge an indebtedness owed by Wasserman to Lyon. Wasserman never reimbursed Gregg for the $20,000.00 he paid to the National City Bank of Houston, nor for the $10,000.00 which he advanced in order to pay the Lyon indebtedness. Both of these obligations owed by Wasserman to Gregg were charged off by Gregg as bad debts in his income tax returns.

During the month of January, 1950, there was drilling activity on a lease adjacent to certain property owned by the City of Corpus Christi, near Mathis, Texas, where the City maintained a storage reservoir as a part of its water works system. The well then being drilled near the City's property was known as the Ella Wade No. One. Susser attempted to get information in regard to this well and by entering upon the premises with city employees who were entitled to go upon the Wade property, he managed to see the record of the Schlumberger test. The showing of the Ella Wade was favorable, and a lease upon the adjoining property owned by the City of Corpus Christi thereupon became highly desirable. On January 14, 1950, the Manager of the City of Corpus Christi advised that bids for an oil and gas lease upon property owned by the City of Corpus Christi near the Ella Wade lease would be considered. The time limit for the receiving of bids was set at 5 o'clock P.M. on January 19th. The Ella Wade was completed as a producer on the fifteenth and fourteen bids for an oil and gas lease upon the city property were received by the nineteenth. No paid advertisements were inserted in newspapers with reference to the call for bids, but wide publicity was given to the proposed letting of a lease by the Corpus Christi daily papers. The various bids received were discussed by the city commissioners

and Gregg's bid, embodying a bonus of $30,000.00, was found to be the highest and best bid. The Council, composed of the four City Commissioners and the Mayor, voted unanimously to execute a lease covering the property to Gregg.[2]

It appears that the estimated cost of drilling the proposed well upon the city property, plus the $30,000.00 bonus, amounted to about $80,000.00. Susser informed Gregg that he was unable to pay one-third of this amount and, after negotiations between the two, Gregg finally agreed to assign to Susser an oil payment of $100,000.00 out of a certain percentage of the oil from the well, as, if and when produced.

The above briefly states the evidence relied upon to carry the case to the jury. In our opinion it is insufficient as a matter of law. The rules relating to the necessary quantum of proof in fraud cases are variously stated. It is conceded that an extensive latitude should be exercised in admitting circumstantial evidence where the existence of a conspiracy is in issue. Jernigan v. Wainer, 12 Tex. 189; Vittitoe v. Junkin, Tex.Civ.App., 54 S.W.2d 166, 15 C.J.S., Conspiracy, § 29,[3] p. 1043, but despite the latitude applicable to the admission of evidence, the rule as to the sufficiency of the evidence to meet the requisite standard of proof has been rather strictly stated. Some cases hold that in order to show conspiracy or fraud it is necessary that the evidence be full, clear and satisfactory. Selari v. Selari, Tex.Civ.App. 124 S.W. 997; S. Cantu & Son v. Ramirez, Tex.Civ.App., 101 S.W.2d 820; Fernandez v. Cano, Tex.Civ.App., 108 S.W.2d 310; Elick v. Schiller, Tex.Civ.App., 235 S.W.2d 494, reversed on other grounds, Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997. It is likewise said that fraud will not be presumed, Paxton v. Boyce, 1 Tex. 317; Whitsel v. Hoover, Tex.Civ.App., 120 S.W.2d 930, but that, on the contrary, there is a presumption in favor of honesty and fair dealing. Turner v. Lambeth, 2 Tex. 365; Giddings v. Steele, 28 Tex. 732, 733; Fletcher v. Ely, Tex.Civ.App., 53 S.W.2d 817; Hawkins v. Campbell, Tex.Civ.App., 226 S.W.2d 891. For the purposes of practical application, perhaps the most satisfactory statement of the rule is that evidence which raises no more than a conjecture, suspicion or surmise of fraud is insufficient to take the case to the jury. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059; Green v. Texas & Pacific Ry. Co., 125 Tex. 168, 81 S.W.2d 669; Cole v. Missouri-Kansas-Texas R. Co., Tex.Civ.App., 179 S.W.2d 343, 344; Hayter v. Hudgens, Tex.Civ.App., 268 S.W. 480; Smith's Heirs v. Hirsch, Tex.Civ.App., 197 S.W. 754; Metropolitan Cas. Ins. Co. of New York v. Texas Sand & Gravel Co., Tex. Civ.App., 68 S.W.2d 551. A corollary to this rule, as stated by the Waco Court of Civil Appeals in Perren v. Baker Hotel of Dallas, 228 S.W.2d 311, 317, is that, "Where circumstances are equally consistent with the existence and nonexistence of an ultimate fact (fraud in this case) sought to be established, such circumstances

2. Two additional leases were executed by the City of Corpus Christi in which Gregg was named as lessee. He also acquired by assignment a lessee's interest in a third lease executed by the City. While appellant centers its attack upon the first lease of January 24, 1950, covering 240 acres adjacent to La Fruta Dam and the Nueces River, it also contends that the three subsequent leases of January 31st, March 8th and October 16th, should likewise be set aside as having been procured by fraud.

3. While the rule is admittedly liberal, this liberality can not be extended to the limit contended for by appellant. Upon the trial, the City sought to introduce in evidence various ex parte statements reputedly made by Wasserman outside the presence of Gregg or Susser. This evidence was properly rejected. In North River Ins. Co. of New York v. Daniel, Tex.Civ.App., 101 S.W.2d 401, 402, it was said that: "It is a well-established rule that the acts and ex parte declarations of one alleged conspirator occurring out of the presence of other alleged conspirators are inadmissible against said other alleged conspirators where there is no other evidence from which a conspiracy can be inferred." See also, Garcia v. Volpe, Tex.Civ.App., 17 S.W.2d 1087; Reliance Ins. Co. v. Smith, Tex. Com.App., 66 S.W.2d 675.

are wanting in probative force as any evidence tending to establish the existence of the ultimate fact."

In applying the rules above stated to the record before us, it is well to consider those necessary elements of a fraudulent conspiracy which are not shown by direct evidence and hence must be supplied by inference. There are also certain matters established by the undisputed evidence which can not be ignored. Although there is evidence that Wasserman and Susser were friends, there is no direct evidence that Susser ever talked to Wasserman about Gregg's obtaining a lease· upon the city property. Similarly there is no direct testimony that Wasserman urged or suggested to any member of the city council that the oil and gas lease be awarded to Gregg. It is undisputed in the evidence that the bid made by Gregg for the oil and gas lease in question was the highest and best bid made for ·the lease. Likewise, it is undisputed that the Ella· Wade was a known producer prior to the time the bidding for the City lease was closed. It does not appear that Susser's attempts to gain information relating to· the ·Ella Wade well resulted in his obtaining any particular informational advantage. Appellant's position in its brief, as we understand it, is not that Susser and Gregg were possessed of information superior to that possessed by others in the Corpus Christi area, or that Gregg's bid was not the highest and. best received, but rather that the city council, being corruptly influenced, had acted with unseeming haste in awarding the lease upon the property, and that 'had the time been extended beyond January 19th, other and larger oil producing companies may have been induced to bid for the lease.

We may assume that the making of. the $20,000.00 loan to Wasserman by Gregg, upon a relatively short acquaintance, constituted a suspicious circumstance and that Gregg on January 4th desired the assistance of Wasserman in securing leases from the City of Corpus Christi in the future.· But from this circumstance it can hardly be inferred that Wasserman attempted to and was successful in corrupting the members of the city council and thus caused them to set an unreasonably short period of time for the receiving of bids. In order to arrive at such conclusion, it is necessary to employ surmise and conjecture and thus violate the rule which demands a higher quality of probative force. No reversible error is presented by appellant's first point and it is accordingly overruled.

By its second point, the City complains of the action of the trial court in sustaining a special exception which resulted in the striking from the petition of all allegations relating to the complaint that the· leases in question violated the provisions of Article ` 5400a, Vernon's Ann.Tex.Stats. This point squarely raises the question of whether of not said Article 5400a is applicable to oil and gas leases executed by a city or town.

Article 5400a was adopted by the Forty-fifth Legislature, Acts 1937, p. 568, ch. 279. This Act and the earlier statute relating to the leasing of lands belonging to cities and towns, Article 1267, Vernon's Ann.Tex. Stats., are set out in the margin in order to facilitate comparison.[4] By its terms, the 1937 Act applies to "political subdivisions which are bodies corporate with recognized and defined areas." It purports to authorize political subdivisions of the State of Texas to lease lands owned by them for mineral development purposes and prescribes the procedure to be followed in the making of such leases. One·of the requisites set forth in the Act is the giving of notice of an intention to lease, which shall be published in some newspaper of general

4.  "Art. 1267. Oil and mineral lands
    "Cities and towns chartered or ·organized under the general laws of Texas, or by special Act or charter, which may own oil or mineral lands, shall have the power and right to lease such oil or mineral lands for the benefit of such town or city, but shall not lease for such purposes any street or alley or public square in said town or city, or any land therein dedicated by any person to public uses in such town or ·city; and no well shall ·be drilled within the thickly settled portion of any city or town, nor within two hundred feet of any private residence. Acts 1919, p. 183."

circulation for a period of three consecutive weeks. Appellees concede that in awarding the leases here involved the City of Córpus Christi did not advertise the proposals in the detail set forth in Article 5400a, but strongly urge that said article has no application to cities and towns. Their argument is that long prior to 1937, the Legislature had adopted an Act which authorized cities and towns to lease lands owned by them for mineral purposes. Acts 1919, p. 183, Article 1267, Vernon's Ann. Tex.Stats.[5] It is pointed out that said Article 1267 is specific in two particulars, in that it relates to cities and towns and to the execution of oil, gas and mineral leases. In other words, it specifically authorizes cities and towns to execute oil and gas leases. Because of this fact, it is contended that the more general Act of 1937, which did not attempt to amend Article 1267, has no application to cities and towns. As supporting the proposition that the specific enactment controls over the general one, appellees cite such cases as Ellis v. Batts, 26 Tex. 703, and State v. The Praetorians, 143 Tex. 565, 186 S.W.2d 973, 158 A.L.R. 596. It is said that the Legislature intended that the 1937 Act should apply only to those political subdivisions which prior to that time had no power or authority to execute oil and gas leases upon lands belonging to them. As supporting this view, reference is made to the caption and emergency clause of the Act, which undoubtedly indicate that one of the dominant purposes of

5. "Authorizing Political Subdivisions to Lease Lands for Mineral Development.

[Article 5400a, Vernon's Ann.Tex.Stats.]

H. B. No. 861.

CHAPTER 279.

Be it enacted by the Legislature of the State of Texas:

"Section 1. Political subdivisions which are bodies corporate with recognized and defined areas, are hereby authorized to lease for mineral development purposes any and all lands which may be owned by any such political subdivision.

"Sec. 2. The right to lease such lands shall be exercised by the governing board, the commission or commissioners of such political subdivision which are by law constituted with the management, control, and supervision of such subdivision, and when in the discretion of such governing body they shall determine that it is advisable to make a lease of any such lands belonging to such district or subdivision, such governing body shall give notice of its intention to lease such lands, describing same, by publication of such notice in some newspaper published in the county, having a general circulation therein, once a week for a period of three (3) consecutive weeks, designating the time and place after such publication where such governing body will receive and consider bids for such mineral leases as such governing body may determine to make. On the date specified in said notice, such governing board or body shall receive and consider any and all bids submitted for the leasing of said lands or any portions thereof which are advertised for leasing, and in the discretion of such governing body shall award the lease to the highest and best bidder submitting a bid therefor, provided that if in the judgment of such governing body the bids submitted do not represent the fair value of such leases, such governing body in their discretion may reject same and again give notice and call for additional bids, but no leases shall in any event be made except upon public hearing and consideration of said bids and after the notice as herein provided.

"Sec. 2a. Provided that all such leases may be granted by public auction and that no leases shall be executed in any case except and unless the lessor shall retain at least one-eighth royalty, provided further that in no case shall the primary term of said lease be for more than a period of ten (10) years from the date of execution and approval thereof.

"Sec. 3. The fact that political subdivisions of the State have lands owned, held, and used for public purposes but which purposes will not be hindered or interfered with by the development of said lands for mineral purposes, and that some of said lands have possibilities of minerals therein and that development of said lands for mineral purposes is necessary in order to conserve said mineral estate and prevent the loss thereof, create an emergency and an imperative public necessity that the Constitutional Rule requiring bills to be read on three several days in each House be suspended and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted."

the Act was to either confer or make abundantly clear the power of political subdivisions to execute oil and gas leases.

To say, however, that the 1937 Act applies only to those political subdivisions which prior thereto possessed no authority to execute leases is to run afoul of the decision of the Eastland Court of Civil Appeals in Culver v. Miears, 220 S.W.2d 200, in which the Supreme Court refused a writ of error. In the cited case the controlling question was whether or not Article 5400a applied to an oil and gas lease executed by a common school district. The Court held that such school districts were authorized to execute oil and gas leases prior to the enactment of Article 5400a. The particular statutory provision mentioned was Article 2753, Vernon's Ann.Tex.Stats., which authorizes the school trustees to make sales of property belonging to school districts. There being no conflict between the provisions of the two articles, 2753 and 5400a, the Court held that both were applicable to an oil and gas lease executed by a school district and that before a valid lease could be made it was necessary to comply with the notice provisions of Article 5400a.

The only distinction we find between the present case and Culver v. Miears is that here we have an earlier specific provision relating to the execution of a mineral lease, while in the Miears case the provision was one relating generally to sales, which was construed as embracing the authority to execute an oil and gas lease. This difference seems an insufficient basis upon which to logically base a contrary holding. The issue therefore is whether or not Culver v. Miears should be followed. There is some discussion in the briefs as to the effect of the Supreme Court's refusing a writ of error in the cited case. It is said that the Supreme Court, by refusing the writ, did not necessarily approve the holding of the Court of Civil Appeals [220 S.W.2d 202] to the effect that prior to the enactment of Article 5400a, "there was nothing to prevent the trustees from leasing land belonging to the district." It is then argued that the Miears case is consistent with appellees' contention that

Article 5400a applied only to those political subdivisions which did not theretofore possess the power and authority to execute oil and gas leases and that a common school district such as that involved in the Miears case was actually a political subdivision within that classification.

We think the refusal of the writ in the Miears case was at least an indication by the justices who then composed the Supreme Court, that they would probably follow the holdings set forth in the opinion of the Court of Civil Appeals in a future case presenting a similar factual situation. Furthermore, it seems reasonably clear to us that common school districts were possessed of authority to execute oil and gas leases prior to 1937, when Article 5400a was adopted and consequently we see no reasonable basis for making a distinction between common school districts, on one hand, and cities and towns, on the other, insofar as the applicability of Article 5400a is concerned.

The cardinal rule of statutory construction is to ascertain the intention of the Legislature, 50 Am.Jur. 200, Statutes, § 223, and when a statutory enactment contains plain and unambiguous language and conveys a clear and definite meaning, there is no occasion for resorting to other rules of statutory interpretation. 50 Am.Jur. 204, Statutes, § 225. The Legislature is presumed to mean what it says. Article 5400a, by its wording, applies to "political subdivisions which are bodies corporate with recognized and defined areas." "Certainly a city, just as an irrigation district (or a school district) is a political subdivision of the State for such governmental purposes, as are given in charge to it." Supreme Forest Woodmen Circle v. City of Belton, 5 Cir., 100 F.2d 655, 657; Ex parte Ernest, 138 Tex.Cr.R. 441, 136 S.W.2d 595. The crucial portion of Article 5400a here involved is that relating to notice. Obviously, there is no conflict between the provisions of Article 5400a, prescribing notice by newspaper publication and Article 1267, which contains no provisions relating to notice. In the cases cited by appellees in support of the proposition that a specific

enactment will not be controlled by a subsequent enactment in general terms, it will be found that there was a repugnancy between the respective enactments. In State v. The Praetorians, 143 Tex. 565, 186 S.W.2d 976, 158 A.L.R. 596, a prior specific statute exempting fraternal benefit societies from excise taxes and a subsequent general statute purporting to levy a tax of this nature, apparently applicable to such societies, were involved. The Supreme Court held that:

"By the terms of the unemployment compensation law it is made applicable 'to any individual or type of organization.' This language, on its face, would include fraternal benefit societies, but by the application of well settled principles of statutory construction the conclusion follows that this law, being a general statute, did not operate to repeal the special law above referred to exempting fraternal benefit societies from excise taxes. The special law will be regarded as an exception to the general law."

When there is conflict, the specific enactment may be construed as controlling over the general,[6] but when there is no conflict between two statutes the legislative intent must be ascertained by construing the two acts together. " 'All acts in pari materia' said Lord Mansfield, 'are to be taken together as if they were one law.' (Sedg. 247.) There is no doctrine in relation to the construction of statutes more certainly settled than this: that all acts in relation to the same subject are to be taken in pari materia and considered as one act." Cain v. State of Texas, 20 Tex. 355, 362; United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; 39 Tex.Jur. 253, Statutes, § 135; 2 Sutherland, Statutory Construction, 3rd Ed., § 5204. This was the rule applied by the Eastland Court in

Culver v. Miears, and is deemed controlling here. The trial court erred in sustaining the special exception and striking from the petition the allegations relating to a non-compliance with the provisions of Article 5400a.

The trial court also sustained certain special exceptions which resulted in striking all allegations of the petition alleging a non-compliance with the provisions of Sections 17 and 18 of Article 2 of the City Charter, and Article 1112, Vernon's Ann. Tex.Stats. As we understand the charter sections referred to, they require publication of ordinances relating to grants of easements and franchises which involve the use of streets, highways, public thoroughfares and property of the city, its avenues, parks, bridges and other public places and property, but do not apply to the execution of oil and gas leases. Likewise, Article 1112 relates to the sale or encumbrance of a "light or water works system." The execution of an oil and gas lease which does not render operation of such system ineffective or impossible can not be considered as the sale of the "system." The lease does not operate to hypothecate the system as security for a debt and is consequently not an encumbrance within the meaning of the statute.

For the error pointed out, the judgment of the trial court must be reversed. We have herein discussed such matters as may arise upon a retrial of the case. Other points contained in the briefs raise questions which need not and probably will not arise upon a second trial, and hence discussion of them is pretermitted.

The judgment appealed from is reversed and the cause remanded.

The CHIEF JUSTICE concurs in the foregoing, but remains of the opinion that

6. There may be some conflict between the provisions of Article 5400a, "authorized to lease for mineral development purposes any and all lands * * *," and Article 1267, "have the power and right to lease such oil or mineral lands * * *, but shall not lease for such purposes any street or alley or public square * * *," occasioned by the exceptions set forth in Article 1267. The rule of State v. The Praetorians, supra, might have application to this situation, but that question is not before us in the present case.

appellees' motion to affirm on certificate should have been sustained. See dissenting opinion, City of Corpus Christi v. Gregg, Tex.Civ.App., 267 S.W.2d 478, 481.

### On Motion for Rehearing

All parties hereto have filed motions for rehearing. We reversed the judgment of the trial court upon a holding that certain special exceptions had been improperly sustained. For such error, a remand of the cause rather than a rendition of judgment is deemed appropriate. We will not anticipate what may occur upon another trial and are of the opinion that no further discussion of appellant's motion for rehearing is necessary. Said motion is overruled.

■ By separate arguments filed in support of their motion, Gregg and Susser urge that Article 5400a, Vernon's Ann.Civ. Stats., does not apply to a home rule city, because a municipality when acting in a proprietory capacity can not be properly classified as a "political subdivision."

It is well settled that a city performs both governmental and proprietory functions. As pointed out in the arguments, the case cited by us as authority for the proposition that a city is a political subdivision of the State, expressly recognized this dual capacity. Supreme Forest Woodmen Circle v. City of Belton, 5 Cir., 100 F.2d 655. We are also cited to the 1953 Act relating to oil and gas pooling agreements which refers to "Cities and towns chartered or organized under the General Laws of Texas, or by special act or charter," and to "Political subdivisions which are bodies corporate with recognized and defined areas", thus suggesting that the Legislature recognized two species of public or political subdivisions, namely, cities and towns, on the one hand, and counties, water districts and the like, on the other. Acts 1953, 53rd Leg. p. 686, Ch. 262, Art. 5421n, Vernon's Ann.Tex.Stats. There are in Texas various types and species of political and municipal organization and, as a general rule, such organization may be classified as belonging to two principal categories, namely, municipalities and political organizations more nearly analogous to counties. See Bennett v. Brown County Water Improvement District No. 1, Tex.Sup., 272 S.W. 2d 498, particularly the dissenting opinion of Mr. Justice Wilson, in which the history of English and American cities and counties and kindred organizations is carefully traced.

In view of these historical distinctions, it would have been appropriate to have referred to both cities and other political subdivisions in providing for a general preliminary notice of an intention to execute an oil and gas lease. An Act containing such references could probably have been more accurately indexed and catalogued with reference to the Revised Statutes as relating to "Cities, Towns and Villages," as well as to the general subject of "Lands-Public." The draftsmen who prepared the 1953 bill (now Art. 5421n) may have had these considerations in mind. But, when we return to the actual words used by the Legislature in Article 5400a, it is difficult to escape the conclusion that cities are included within the phrase, "political subdivisions which are bodies corporate with recognized and defined areas," particularly in view of the decision in Culver v. Miears, Tex.Civ.App., 220 S.W.2d 200. The Act does not say, "political subdivisions which exercise governmental power only," nor does it say that the notice provisions shall be inapplicable to a political subdivision when acting in a proprietory as distinguished from a governmental capacity.

A school district, when engaged in educating the children of the State, may be said to be exercising a governmental function. Similarly a city, when enforcing a health regulation, is exercising a governmental function. Ex parte Ernest, 138 Tex.Cr.R. 441, 136 S.W.2d 595. Money is required to carry out either function and the end purpose sought to be obtained by the execution of an oil and gas lease is the procurement of funds necessary for the operations of the organization. Insofar as the nature of the act is concerned, it is difficult to draw a logical distinction between the execution of an oil and gas lease

by a city, on one hand, and a school district, on the other hand. It seems that there is no true distinction, and in order to raise an apparent one it must be argued that the execution of the lease by a school district is necessarily governmental in nature, because a school district has no proprietory powers. And if this distinction be forced, the doctrine of the Miears case is not avoided, for such distinction is not made by the statute therein construed. There are numerous differences between cities and school districts, but if the usual and ordinary meaning be given to the words employed by the Legislature it seems that both are comprehended by the phrase, "political subdivisions which are bodies corporate with recognized and defined areas." If Article 5400a is applicable to a school district it is likewise applicable to a city.

In determining the intent of the Legislature our primary guide must of necessity be the wording contained in the statute. Article 5400a is admittedly a statute which is wide in its scope of operation. It has for its purpose the safeguarding of the properties of political subdivisions of the State by requiring a notice of intention to lease for oil and gas. The scope and purpose of the statute is well within the legislative authority and we may not properly restrict its operation to something less than that prescribed by its wording. Such a construction would defeat the announced legislative intent and contribute to confusion rather than lessen it.

Furthermore, in view of the Supreme Court's refusal of the application for writ of error in Culver v. Miears, we are not at liberty to depart from the holding contained therein. Agnew v. Coleman County Electric Co-operative, Tex.Sup., 272 S.W. 2d 877; Bennett v. Brown County Water Improvement District No. 1, Tex.Sup., 272 S.W.2d 498; Mitchell v. Town of Refugio, Tex.Civ.App., 265 S.W.2d 261, wr. ref.; 21 C.J.S., Courts, § 197, p. 343.

We adhere to the holdings announced in our original opinion and appellees' motion for rehearing is accordingly overruled.